```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         WESTERN DIVISION
```

Fifth Third Processing,       )
Solutions, LLC,               )
                              )
            Plaintiff,        ) Case No. 1:11-CV-247
                              )
     vs.                      )
                              )
Michael Elliott,              )
                              )
                              )
            Defendant.        )

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

On April 21, 2011, Plaintiff Fifth Third Processing Solutions, LLC ("FTPS") filed a complaint for a preliminary and permanent injunction against Defendant Michael Elliott. FTPS asserts two related causes of action against Elliott: 1) Elliott breached the non-solicitation clause in his employment contract when he left FTPS and accepted a similar position with Fiserv, Inc.; and 2) Elliott violated Ohio's version of the Uniform Trade Secrets Act, Ohio Rev. Code § 1333.61, et seq., by emailing to his personal account certain proprietary and confidential documents of FTPS, including customer lists and pricing information, before the termination of his employment with FTPS. FTPS seeks the following relief:

>(a) A preliminary and permanent injunction, enjoining and restraining Defendant for one year from the date of Defendant's resignation, directly or indirectly, individually or on behalf of or in concert with any other person or entity, from soliciting, attempting to solicit, or otherwise interfering with FTPS's relationship with any client or prospective client;

> (b) A preliminary and permanent injunction ordering Defendant to keep in strict confidence and not to disclose in any manner any confidential, proprietary, and trade secret information of FTPS to any person, group, or entity or use such information for any purpose whatsoever, including (but not limited to) information regarding the terms of any coaches' [sic] contracts.
>
> (c) That Defendant be compelled to identify and disclose to FTPS any and all communications that either he or any other employee, officer, or agent of Fiserv had with any client or prospective client of FTPS related in any way to (1) Defendant's resignation from FTPS; (2) Defendant's employment with Fiserv; and/or (3) the potential or possibility of Defendant providing services for the client or prospective client after Defendant's resignation from FTPS on November 30, 2010.
>
> (d) That this Court order that Defendant immediately return to FTPS all information or any other materials belonging to FTPS, or relating to the business of FTPS, and all copies thereof in any form, keeping no copy for himself.

Complaint (Doc. No. 1), at 11-12.  FTPS also seeks an award of compensatory and punitive damages, costs, and attorney's fees.

The case came before the Court on September 26, 2011 for an evidentiary hearing on FTPS's complaint for a preliminary injunction.  The parties then submitted post-hearing briefs (Doc. Nos. 20 & 21).  The Court, having considered the pleadings filed by the parties, the evidence presented at the hearing, and the post-hearing briefs of counsel, hereby enters the following Findings of Fact, Conclusions of Law, and Order.  Fed. R. Civ. P. 52(a)(2).  To the extent that the foregoing findings of fact

should more properly be considered conclusions of law, and vice versa, they are hereby adopted as such.

## I. Findings of Fact

### A. Subject Matter Jurisdiction

1. Plaintiff FTPS is a Delaware company with its principal place of business located in Cincinnati, Ohio. Complaint ¶ 2; Answer ¶ 2. FTPS, therefore, is a citizen of the States of Ohio and Delaware. Franzel v. Kerr Mfg. Co., 959 F.2d 628, 629 (6th Cir. 1992).

2. Defendant Michael Elliott is a citizen of the State of Indiana. Complaint ¶ 3; Answer ¶ 3.

3. The amount in controversy in this case is in excess of $75,000. Complaint ¶ 5; Sellers v. O'Connell, 701 F.2d 575, 578 (6th Cir. 1983) ("The general rule is that the amount claimed in good faith by the plaintiff controls unless it appears to a legal certainty that the claim is for less than the jurisdictional amount or unless the amount claimed is merely colorable.").

4. The Court has subject matter jurisdiction over this case because the parties are citizens of different states and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a).

### B. Background

5. The complaint describes FTPS's business as follows:

> Formerly a division of Fifth Third Bank, FTPS provides complete payment strategies for businesses and financial institutions around the world. FTPS provides services and solutions related to credit card and debit

> card processing, electronic benefits transfer (EBT), online payment acceptance, private label credit and debit cards, gift card programs, credit card call center support, electronic funds transfer (EFT) services, ATM services and network support.

Complaint ¶ 6.

6. Defendant began working for FTPS in 1999. As is relevant here, Defendant's final position with FTPS was vice president of sales. Elliott Dep. (Ex. 19), at 121-25. Defendant was responsible for selling FTPS's EFT services to other financial institutions. In this position, Defendant had access to a number of confidential documents of FTPS, including customer lists, pricing information, and marketing strategies, through a shared computer drive.

7. Defendant's employment with FTPS was governed by a contract entitled "2010 Incentive Compensation Plan." Ex. 1 ("the Plan"). The Plan contains a non-solicitation and non-disclosure provision in which the Defendant agreed, for a period of one year following the termination of his employment with FTPS, not to solicit customers or prospective customers, or accept the business of such customers, with whom he "had contact, involvement, or responsibility during his [] employment with FTPS." Id. §§ VII(a), (b) & (c). This section, however, does not prohibit Defendant from accepting employment that competes with FTPS so long as he does not violate the terms of the Plan. Id. § VII. In other words, under the terms of the Plan, Defendant is free to

4

accept employment with a competitor of FTPS as long as he does not violate, inter alia, the non-solicitation provisions of § VII of the Plan.

8. Defendant also agreed under the Plan that he would not disclose FTPS's trade secrets and confidential information to third parties or use such information for the benefit of anyone other than FTPS. Id. § VII. The Plan defines confidential and proprietary information as "customer names or lists, financing information, technical information, designs, processes, procedures, policies, improvements, business plans, pricing structures, price and fee schedules, supplier lists, referral sources, records, blueprints, software programs, financial information and notes, letters, documents and other papers relating to the business or work of FTPS[.]" Id.

9. Defendant began interviewing for a position as Regional Sales Executive with Fiserv, Inc. ("Fiserv") in August 2010. Fiserv provides "core processor" services to financial institutions which are allegedly broader than but nonetheless overlap the services provided by FTPS. In his deposition, Defendant explained that a core processor "offers back-office functionality for the front line of a bank or credit union, so the teller line is using the core processing platform, mortgage software, lending software, everything basically banking- and credit union-related." Elliott Dep. (Ex. 19), at 15.

10. Defendant accepted the Regional Sales Executive position with Fiserv on November 4, 2010 with an effective starting date of December 1, 2010. Ex. 6. Defendant's duties in this position are to sell debit card processing services to financial institutions who are already using Fiserv as a core processor. Elliott Dep. at 14.

11. Defendant notified FTPS that he was resigning on November 17, 2010 with an effective resignation date of December 1, 2010.

12. In the six weeks immediately preceding his final day with FTPS, Defendant downloaded from FTPS's computer system a number of proprietary and confidential documents which he then sent to his personal email account with gmail. He then downloaded these documents onto his personal Apple laptop computer.

13. Among the most significant of these documents are files related to the "Barbell Plan," which generally speaking is FTPS's internal analysis of its clients, revenues, contract dates, and other financial metrics. Ex. 11. FTPS's forensic computer analyst, however, could not determine whether Defendant had opened and read any of these files.

14. Defendant testified that he has not printed out or used any of these documents or information to compete against FTPS nor has he shared this information with any other person. Defendant surrendered his laptop computer to his attorney. Defendant's gmail account is still active with FTPS's documents still

resident in it, but the account is password protected and Defendant testified that he has not used this account since the commencement of litigation.

## II. Standard of Review

This is a diversity case and so the Court applies the same substantive law that the state courts in Ohio would apply. Corrigan v. U.S. Steel Corp., 478 F.3d 718, 724 (6th Cir. 2007). The parties both agree that Ohio law applies in this case. Moreover, the parties' agreement under the Plan has an Ohio choice of law clause which should be enforced absent public policy concerns which are not evident here. Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 541 (6th Cir. 2007); Jarvis v. Ashland Oil, Inc., 478 N.E.2d 786, 789 (Ohio 1985). Accordingly, Ohio substantive law applies in this case to determine whether FTPS is likely to succeed on the merits. Certified, 511 F.3d at 541.

Whether FTPS is entitled to a preliminary injunction is a procedural question controlled by federal law. Southern Milk Sales, Inc. v. Martin, 924 F.2d 98, 102 (6th Cir. 1991). In a diversity case, the quantum of proof necessary to establish a claim is determined by state law. See Disner v. Westinghouse Elec. Corp., 726 F.2d 1106, 1111 (6th Cir. 1984) (district court erred when it instructed jury that plaintiff need only prove fraud claim by preponderance of the evidence when Michigan law

7

required fraud to be established by clear and convincing evidence). Ohio requires the plaintiff to prove a claim for injunctive relief by clear and convincing evidence. Mead Corp. v. Lane, 560 N.E.2d 1319, 1324 (Ohio Ct. App. 1988). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford, 120 N.E.2d 118, 119-20, syl. 3 (Ohio 1954).

Therefore, in this case, the Court applies the federal standards for obtaining a preliminary injunction, i.e., an assessment of the plaintiff's likelihood of success on the merits, the threat of irreparable harm to the plaintiff, the risk of injury to others, and the public's interest in granting injunctive relief. Hamad v. Woodcrest Condominium Ass'n, 328 F.3d 224, 230 (6th Cir. 2003). State law applies to the determination whether FTPS is likely to succeed on the merits of its claims. Certified, 511 F.3d at 541. Additionally, state law supplies the quantum of proof needed for FTPS to obtain injunctive relief. In this case, the clear and convincing evidence standard applies. Disner, 726 F.2d at 111. Finally, the Court recognizes that the preliminary injunction

8

considerations are factors to be balanced, and not prerequisites to be met, with no one factor controlling. Hamad, 328 F.3d at 230. Generally, however, a finding that the plaintiff is not likely to succeed on the merits should result in the denial of injunctive relief. Id. Similarly, a claim for injunctive relief will fail without a showing of irreparable harm. Aluminum Workers Int'l. Union, AFL-CIO, Local Union No. 215 v. Consolidated Alum. Corp., 696 F.2d 437, 444 (6th Cir. 1982).

### III. Conclusions of Law

#### A. Breach of Contract

##### 1. FTPS is not likely to succeed on the merits of its breach of contract claim

To prove a claim for breach of contract, the plaintiff must establish "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." Nilavar v. Osborn, 738 N.E.2d 1271, 1282 (Ohio Ct. App. 2000). Two provisions of the Plan are at issue here. One, the non-solicitation provision, and, two, the provision that requires Defendant to maintain the confidentiality of FTPS's confidential information and trade secrets.

As the Findings of Fact indicate, the non-solicitation provision prohibits Defendant from soliciting customers with whom he had "had contact, involvement, or responsibility during his [] employment with FTPS" for a period of one year. It does not prohibit Defendant from all competition with FTPS and indeed does

9

not prohibit Defendant from soliciting FTPS clients with whom he did not have "contact, involvement, or responsibility during his [] employment with FTPS." FTPS did not put on any evidence - much less clear and convincing evidence - that during his employment with Fiserv, Defendant has actually solicited or attempted to solicit any former client with whom he had "had contact, involvement, or responsibility during his [] employment with FTPS." Therefore, FTPS is not likely to succeed on a claim against Defendant for a past breach of the non-solicitation provision.

     FTPS's claim or concern regarding breach of the non-solicitation provision is more in the nature of an anticipatory breach - i.e., that Defendant is likely to breach the Plan due to his alleged improper possession of FTPS's confidential materials. An anticipatory breach, however, requires an unequivocal repudiation of the contract by the other party. Southeast Land Dev., LTD v. Primrose Mmgt, LLC, 952 N.E.2d 563, 568 (Ohio Ct. App. 2011). In this case, though, Defendant has not unequivocally repudiated the non-solicitation clause. Indeed, he has affirmatively stated under oath that he intends to abide by the terms of that clause. See id. at 569 (party repudiates contract by failing to give adequate assurance of performance). Therefore, the Court concludes that FTPS has not adduced clear and convincing evidence that Defendant has repudiated the non-

solicitation clause.  Consequently, FTPS is not likely to succeed on the merits to the extent it claims that Defendant has anticipatorily breached the Plan.

The Court concludes further that FTPS is unlikely to succeed on the merits of its breach of contract claim based on Defendant's emailing and downloading FTPS's confidential and proprietary information to his personal computer.  The terms of the Plan do not prohibit the employee from retaining FTPS's confidential and proprietary information or compel him to return such information to FTPS upon the termination of his employment.  Rather, this provision imposes only two duties: 1) the employee shall only use such information for FTPS's benefit; and 2) the employee shall not disclose such information to third parties.  Defendant, therefore, did not breach the Plan merely by emailing these documents to his personal computer and retaining them after the termination of his employment with FTPS.

Moreover, FTPS generally failed to present evidence that Defendant has used its confidential information for the benefit of others or that he has disclosed it to third parties.  Defendant denied under oath that he has used or shared this information with others.  His testimony is generally corroborated by FTPS's own forensic analyst, who indicated there was no evidence that Defendant had opened or read these documents.

Defendant did admit that he sent Laura Johnson copies of a sales report to help her resolve a dispute she was having with FTPS over sales commissions she felt she was owed after the termination of her employment with FTPS.  Even assuming that this constitutes a past breach of the Plan, the Court concludes that it does not justify granting prospective injunctive relief.  The Defendant is no longer in possession of any of FTPS's confidential information.  Defendant's attorney has his personal laptop computer which can be turned over to FTPS to be scrubbed of its documents.  Defendant's email account remains live, but Defendant's attorney can work with FTPS to take steps satisfactory to both parties to delete those documents and close out the account.  The Defendant simply is not in a position to share or use these documents to FTPS's disadvantage at this point.

Accordingly, the Court concludes that FTPS is not likely to succeed on the merits of its breach of contract claim.

### B. Misappropriation of Trade Secrets

FTPS has also sued Defendant for misappropriation of trade secrets under Ohio's version of the Uniform Trade Secrets Act, Ohio Rev. Code § 1333.61, et seq.  This act authorizes courts to enter injunctions to prevent actual or threatened acts of misappropriation of trade secrets.  Ohio Rev. Code § 1331.62.  A "trade secret" is:

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1331.61(D). "Misappropriation" means:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;
>
> (2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:
>
> (a) Used improper means to acquire knowledge of the trade secret;
>
> (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;
>
> (c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code § 1333.61(B). "Improper means" "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Ohio Rev. Code § 1333.61(A).

> 1. <u>Even if FTPS is likely to succeed on the merits of its misappropriation claim, it has not shown that it will be irreparably harmed in the absence of injunctive relief</u>

The Court will assume for purposes of the pending motion that the documents Defendant emailed himself were trade secrets of FTPS and that he obtained them by improper means. As discussed above, however, FTPS has not shown that Defendant has actually disclosed its confidential information or used it in anyway to compete against it. Defendant has returned all of the documents to FTPS, his personal computer is in the custody of his attorney, and his email account can be readily closed out. Thus, Defendant's alleged past acts of misappropriation have been largely if not completely remedied. The salient question, therefore, is whether FTPS has shown threatened misappropriation of trade secrets. The Court concludes that it has not.

The seminal Ohio case on threatened misappropriation is <u>Proctor & Gamble Co. v. Stoneham</u>, 747 N.E.2d 268 (Ohio Ct. App. 2000). In <u>Stoneham</u>, the defendant was a senior-level manager in Proctor & Gamble's hair care division. The court described the defendant's involvement with this division as follows:

> Stoneham's expertise was the foreign markets, that is, the markets other than the United States, and the needs

14

>of the foreign consumers, the products that sold best in the foreign markets, the areas in which P&G should concentrate its resources to increase sales in haircare products, and the types of claims and advertising that would be most successful in foreign markets.
>
>As part of his job, Stoneham was also privy to the development of new haircare products by P&G. He knew, among other things, which products were closest to market, when and where they would be launched, the target consumers, the type of advertising to be used, the strengths and weaknesses of the products, the strengths and weaknesses of the company's scientific backup for its claims about the products, the price for the new products, and the targeted profits. He was also involved in the "relaunch" or revitalization of existing products, and knew, among other things, which products were going to be relaunched, the perceived weaknesses of the products, the changes made or to be made in the products, the changes in the advertising and marketing focus, and the anticipated costs of the relaunch.
>
>As a member of worldwide multi-functional teams at P&G, Stoneham developed a confidential ten-year marketing plan for one of P&G's hair-conditioning products, participated in the development of new products, and helped develop a ten-year plan for P&G's best-selling brand, Pantene.  <u>No one was more knowledgeable about the foreign marketing of P&G' s haircare products, and no one was more knowledgeable about P&G's hair-conditioning products, both existing and potential, than Stoneham</u>.

<u>Id.</u> at 272 (emphasis added).  The defendant then left P&G to take a position with Alberto-Culver as president of its international hair-care products division.  P&G sued the defendant for breach of the non-competition clause in his employment contract.  P&G also claimed that the defendant's knowledge of its hair care products would inevitably lead to the disclosure of its trade

secrets to Alberto-Culver and sought an injunction to prevent that from occurring.

The <u>Stoneham</u> Court concluded that P&G was entitled to injunctive relief because there was a substantial threat the defendant would disclose P&G's trade secrets to Alberto-Culver. In reaching this conclusion, the Court adopted the "inevitable disclosure" rule which states that "a threat of harm warranting injunctive relief can be shown by facts establishing that an employee with <u>detailed and comprehensive knowledge of an employer's trade secrets and confidential information</u> has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." <u>Id.</u> at 279 (emphasis added). The <u>Stoneham</u> Court determined that the inevitable disclosure rule applied in its case because the defendant had "an intimate knowledge of P&G's confidential information and trade secrets" and that his "position with Alberto-Culver resulted in direct competition between the products that Stoneham formerly supported and the new products for which he held responsibility." <u>Id.</u> The Court also noted that:

> Stoneham developed an initiative called Benchmark 2000, the purpose of which was to identify the best haircare products from around the world and to use information about those products to improve Alberto-Culver's products and expand their sales. Many of the top-selling brands around the world are P&G products.

> Stoneham's testimony shows that the threat of harm
> identified by P&G's other managers was not only
> possible or speculative, but was substantially likely
> to result.  In his new employment, Stoneham directly
> targeted the very products he worked on when employed
> at P&G for increased competition from Alberto-Culver
> products.  He set up global teams like the ones that he
> had been on at P&G to identify Alberto-Culver's
> strategies for competing with P&G specifically and
> increasing sales in haircare generally.  P&G's
> advertising campaigns were specifically discussed.

Id. at 279-80.  Thus, the Court, held that "P&G presented clear and convincing evidence that Stoneham either had already used some of P&G's trade secrets or was substantially likely to use its trade secrets to benefit Alberto-Culver."  Id. at 280.

In this case, it is true that the Defendant accepted a position with Fiserv that is substantially similar to the one he held at FTPS in that he is responsible for selling debt card processing services to financial institutions.  Nevertheless, there is an important distinction between this case and Stoneham which makes the inevitable disclosure rule inapplicable here, and that is in this case the evidence does not show that the Defendant has the detailed and comprehensive knowledge of FTPS's trade secrets, e.g., the Barbell documents and the other information, that the defendant possessed in Stoneham.

In Stoneham, the defendant was essentially responsible for developing and marketing an entire product line and thus had thorough top-down knowledge of every aspect of the product.  In this case, while Defendant was responsible for selling debit card

17

processing services for FTPS and has knowledge of that service, he was not responsible for compiling the information and data contained in the confidential documents.  While Defendant had access to these documents, it cannot be inferred simply from that access that he possesses detailed and comprehensive knowledge of the information contained in documents as would the employees who actually created them.  Thus, Defendant in this case is different from the defendant in Stoneham, who knew everything there was to know about P&G's confidential information and trade secrets just by virtue of his position.  Moreover, as Defendant alludes to in his brief, the Barbell documents and the other alleged trade secrets are lengthy, detailed, and complex documents not susceptible, in the Court's opinion, to ready memorization.  The Barbell documents, for instance, list over 100 clients or potential clients with approximately 75 individual data points for each client.  While Defendant admits taking the documents, he has returned them, surrendered his laptop, and abandoned his email account and the evidence thus far supports his testimony that he has not reviewed or read the documents even though he took them.  Essentially, then, FTPS is in the same position it would have been had Defendant simply opened up the documents and read them on his last day of employment with FTPS.  Defendant would have been exposed to the information to be sure, but given the complexity of the documents, it is not reasonable to conclude

that he would have retained in detail the information he read. Now, almost one year after the termination of his employment with FTPS, it is even less likely that Defendant has retained any detailed knowledge of these documents or can use his exposure to them to FTPS's disadvantage.  Stated another way, it is not inevitable that Defendant will disclose FTPS's confidential information and trade secrets.  Therefore, FTPS has not established a threat of injury and as a consequence is not entitled to injunctive relief under Ohio's trade secrets act.

### C. Irreparable Harm

The Court's discussion in Parts III.A and III.B. illustrates that FTPS is not likely to suffer irreparable harm without injunctive relief.  The evidence does not show that Defendant has used, intends to use, or will inevitably disclose FTPS's confidential information or trade secrets.  Therefore, FTPS will not be irreparably harmed.

### D. The Public's Interest and Harm to Others

Having concluded that FTPS is not likely to succeed on its breach of contract claim and will not otherwise suffer irreparable harm in the absence of injunctive relief, the Court does not need to address these two factors.  <u>Aluminum Workers Int'l. Union, AFL-CIO, Local Union No. 215 v. Consolidated Alum. Corp.</u>, 696 F.2d 437, 444 (6th Cir. 1982).

### Conclusion

For the reasons stated in this order, FTPS's motion for a preliminary injunction is not well-taken and is **DENIED.** Counsel for Defendant, however, are **ORDERED** to meet and confer with counsel for FTPS as soon as possible in order to agree on a procedure acceptable to both parties concerning closing out and deleting or erasing the information contained in Defendant's personal email account.

**IT IS SO ORDERED**

Date October 18, 2011          s/Sandra S. Beckwith
                                Sandra S. Beckwith
                        Senior United States District Judge